So our next case is Dorman v. Annapolis OB-GYN, and I wanted to clarify what we're going to do on argument. So, Mr. Blumenfeld, are you and Mr. Hurley both presenting part of your argument in chief? Yes, Your Honor. The plan with the court's permission is to present on the appellee issues, and Mr. Hurley's status is not to mention or present prior to the argument. Okay, and was somebody going to do a rebuttal on the cross-appeal argument? Yes, Your Honor. All right, and who's that? On the cross-appeal issues, Mr. Hurley is going to handle the cross-appeal. Okay, so what we're going to do is, after we hear from the appellant's opening argument, you and Mr. Hurley will present all of your argument in chief and your primary cross-appeal argument. So when it comes back to you, all we'll hear from you at that point is the rebuttal on the cross-appeal. Okay, all right, Mr. Janet, we'll hear from you. May it please the court. Reversal is required in this case because the district court committed a number of fundamental errors in managing the trial which prejudiced the plaintiffs. This warrants a new trial on their medical negligence claims against the defendant health care providers. Starting with the cross-examination of Plaintiff's only standard of care expert, Dr. Dubot, the district court erroneously admitted testimony concerning mere accusations of misconduct that had been made to a private organization, ACOG. The testimony about a collateral matter was inadmissible character evidence. Its admission violated Rule 404B's prohibition of the use of prior acts to establish character. Nothing about this case put Dr. Dubot's character at issue. This evidence was intended solely to suggest that Dr. Dubot was not a thorough expert and that he was therefore wrong with respect to his opinion that Dr. Welch violated the standard of care in delivering the child in this case. The defendants argued that the events of the collateral matter showed bias, but they never brought out any evidence of bias before the jury. What they did do was bring up the issue by asking Dr. Dubot if he always thoroughly reviews medical records, probed into a lengthy explanation of the incident, and tried to poke holes in it to make him look like a careless expert, and then, in closing argument, summed up the cross-examination by stating that Dr. Dubot, quote, has a history of being wrong, unquote. Defendants' use of this evidence confirms that it had nothing to do with bias, and its improper admission resulted in precisely the type of trial within a trial that the federal rules of evidence are designed to prevent. Indeed, we delved more deeply into the facts of this collateral matter than the issues that were seen to be inappropriate character evidence in the case of Smith v. Baltimore City Police Department. In that case, there was evidence of prior arrests, and the district court was found to have abused its discretion by letting that information in. Similarly to that case, the accounts of what happened were very different on each side, and so the main issues hinged on which witness the jury believed. Thus, the jury's view of credibility and character was necessarily central to its verdict, and this is a quote from Smith, once the jury heard the evidence, it's reasonable that they assumed where there's smoke, there's fire. Wasn't that going to be true in any claim of bias? Would what be true in any claim of bias? Well, in this case, understand the evidence. Dr. DeBow deviated from the professional authority, American Congress of Obstetricians and Gynecologists. That was never actually determined, Your Honor. He resigned before there was any confirmation. Hang on for a minute. Oh, sorry. All right, so his view and their view apparently were not the same, and he's entitled to that view. But if he left that organization under some type of a cloud, why wouldn't it be logical to think that there could be the basis for bias there, and the jury would be entitled to know that and evaluate it however they saw fit? Well, first of all, Your Honor, bias evidence has been held by the Supreme Court to apply to a particular party. There was no evidence here that Dr. DeBow was biased against Dr. Welch, one of the parties in this case. Instead, the only allegation was that he was biased against an organization that created a document that may have been relevant to the case. In addition to that, if it was indeed being admitted for bias, the defendants should have had an obligation to frame the issue in terms of bias, as opposed to using it the way that they did, which was to attack Dr. DeBow on character grounds. Just like if hearsay can be admitted for certain specific purposes and then it's limited to those purposes, in this case the evidence wasn't used for bias. If I may move on, in addition to allowing this impermissible evidence to be used to undermine plaintiffs' experts' credibility, another error the district court made was to improperly bolster defendants' experts' credibility by interjecting the court's opinion about the quality of a landmark study that plaintiffs relied upon in cross-examination. A little background, defendants' bioengineering expert, Dr. Grimm, opined that the maternal forces of labor, which occur in every delivery, are sufficient on their own to cause permanent brachial plexus injuries. She claims they are unavoidable. The Croft study, on the other hand, found that, in fact, brachial plexus injuries can be prevented by altering management, by delivering providers. This study completely contradicts Dr. Grimm's causation theory, and her only means of attempting to rebut this study was to point out that the study didn't have a quantifiable definition of excessive force, which plaintiffs believe is irrelevant to the basic conclusion of the study, which is that proper management means zero permanent brachial plexus injuries. However, the court agreed with Dr. Grimm, told the jury the study was not meaningful, that the lack of definition of excessive force was a critical part of plaintiffs' questioning, and that the study's observations were, quote, just somebody made some gut judgment, end quote. I think you'll find that the case law establishes that this type of commentary is improper. For example, there's Samuel V. Ford Motor Company, a District of Maryland case that was affirmed in this court, which says that once a judge decides that an expert's testimony is admissible, his or her, quote, role is at an end, then it's up to the jury to determine what weight, if any, to give the expert's testimony. And in this case, the court usurped the jury's function by bolstering Dr. Grimm and not letting the jury decide how much weight, if any, Dr. Grimm's testimony deserved. Well, if the jury, if the court didn't understand and the witness didn't understand and you couldn't explain what excessive traction was, how was the jury supposed to understand it? I don't think that it's the court's role to be bolstering Dr. Grimm's comments on this. Plaintiffs also don't believe that how excessive force is quantified in the study is key to understanding the essential conclusions of it. The reason why this study is so important is that it has shown that with proper management of the shoulders Wouldn't you need a witness to make that argument? I mean, if excessive traction is the causation factor and that's what this study goes to, then I don't, it seems like you're making the argument that counsel's ipsa dixit substitutes for expert testimony on what that would be, that that would have been part of your obligation to have that term defined so that the expert could testify as to it. The plaintiffs weren't introducing the study as, we introduced the study in cross-examination. I think the study contradicted what Dr. Grimm was directly saying about the maternal forces of labor, not that we were introducing it as part of our case in chief. So I think that the, it seems that the key error here was the court agreeing with what the expert was saying in validating the study and saying that the study wasn't meaningful and just the scientist's gut judgment. The court also exacerbated these errors by allowing the defendant doctor's partners to testify that he was a skilled and phenomenal physician. This, again, was character evidence where character was not an issue in this case. It violated Rule 404A, which forbids character evidence. The court erroneously allowed Dr. Welch's partners to tell the jury that he had phenomenal clinical skills, that his judgment was to be trusted, and that he's very- Wasn't one of them at least your own witness? It was during the cross-examination. It was during our direct examination, but it was the defendant's partner that we were bringing up to the stand to provide the background on the- So you ask a- I'm sorry. No, you go ahead. You ask a question, you got an answer you didn't want. And we requested that the court strike the testimony, but the court refused to do so. And so it was your own witness though, right? It was our own witness, but the answer deviated from what we were asking her about. We asked the court to strike the irrelevant character evidence testimony, and the court did not do so. This testimony was impermissible. It improperly enhanced Dr. Welch's credibility. The only purpose and effect of this testimony was to suggest that he was a great obstetrician and couldn't have reached the standard of care in this case. These errors had a significant impermissibly prejudicial impact on Plankton's case. Given that there were no eyewitnesses who saw and remember what happened with Dr. Welch's hands during the delivery and no documentation in the records about what type of force was used, the credibility of the parties and the experts were the key issues for the jury's determination. And the trial court put a thumb on the scales for the defendants via these errors I've already mentioned as well as other errors. For another example, although it is black-letter law that a trial judge may not make comments that give the impression to the jury that he favors one side or the other, the trial court warned the jury five times that they were just getting plaintiffs' spin on the evidence. What is the message that's being communicated here? That the plaintiffs aren't telling it like it is, that you're only hearing the plaintiff's bias, and that the judge did not think that plaintiffs or their case was credible. Defendants, in fact, saw how impactful this repeated phrase was and exploited the district court's improper characterization by using it during their closing arguments. Another example, the trial court also violated Federal Rule of Civil Procedure 37C1 by letting defendants use an animation that hadn't been disclosed in their final exhibit list, which forced plaintiffs to cross-examine defendants' experts about this animation without plaintiffs' own experts ever having seen or reviewed it. Another example, the trial court would not let plaintiffs' experts testify about the amount of lost earning capacity damages, which contravened years of Maryland case law and made plaintiffs appear to be speculating about it, even though there were objective statistics behind their conclusions. Yet the court did let the defendants cross-examine plaintiffs' experts with the exact same data that plaintiffs weren't allowed to testify about, even though the defendants were using what was essentially an undisclosed hearsay expert report that lacked foundation, which cherry-picked the same data on just one specific profession. And then when plaintiffs asked to do the same thing in cross-examining defendants' experts, the court refused to let plaintiffs do that. One final example, the trial court also refused to let the parties even mention Mrs. Ming's scheduled C-section at trial, even though this was documented in relevant hospital records and could have led the jury to conclude that... I thought the parties had agreed that they weren't going to bring up C-section and that the district court directed the parties not to do that based on your agreement. The parties agreed not to argue that C-sections were required by the standard of care. That's very different from saying you're not allowed to mention C-sections at all. Plaintiffs... Well, I thought you got to mention it to the extent to show whether or not one of the experts was sufficiently prepared. We were allowed to mention the prenatal care generally. We weren't allowed to mention C-sections at all. The prenatal care, we argued, was relevant to whether Dr. Welch was prepared, and we do believe that the jury could have... And what would have been the point to mentioning C-sections? I think... Go ahead. The C-section evidence would have allowed the jury to put the prenatal care evidence in the proper context. That sounds like standard of care. Well, it's circumstantial evidence, but it's relevant... Part of your agreement as to why you wouldn't bring it up. Plaintiffs never had the intention of violating or, sorry, disagreeing with what their experts believed and arguing that C-sections were required. All plaintiffs wanted was to properly frame the fact that this was a very large fetus that Dr. Welch's partner had scheduled Mrs. Ming for a C-section out of concern for the baby's weight, and that Dr. Welch was ignorant of that fact when he began the delivery. He failed to review the relevant medical records. All right. So when the parties agreed they weren't going to talk about C-section and the court directed the parties not to do that, did you object? Yes, Your Honor. You objected at that point? It was pre-trial, I believe. There was motions in Lemonet about whether the parties should be... The defendants filed a motion in Lemonet regarding whether the parties should be allowed to say that C-sections were required under the standard of care. The trial court went beyond the motion to say that C-sections shouldn't be mentioned at all. And what did you do at that point? I believe we objected. I'm not 100% sure, Your Honor. Well, why don't you look for that because I'm not aware of that in the record. Okay. Because it seems odd that you would object to a direction of the court that you had agreed to. It wasn't what we agreed to, with all due respect, Your Honor. We agreed that the C-section was not required. Tell us all about that on rebuttal. How's that? Thank you, Your Honor. Okay. All right. So, Mr. Blumenfield, you all are going to make your reply and your argument in chief on the cross-appeal. Yes, Your Honor. May it please the Court, Michael Blumenfield on behalf of Annapolis OB-GYN and Dr. Richard Welsh. I'm here with my colleague, Tim Hurley, as well. Disappointment in a jury's verdict does not equal abuse of discretion. That's what this case is about. That's what this appeal is about. And when you place the evidentiary arguments that are being made by the appellants in the proper context, it is clear that the district court did not abuse its discretion and did not commit reversible error. What we have here is a 10-day trial with numerous expert witnesses, numerous fact witnesses, and rulings for and against both parties during the course of those 10 days. Some went in my client's favor and some went against my client. That is, in a nutshell, what happens at a trial, and that's what happened here. Even if this court was to find that there was some error committed, I would submit to you, and I do submit to you, that they were harmless errors and that the standard here, this abuse of discretion standard, is so high that the appellants would have to demonstrate that the error substantially swayed the verdict. And in this case, there is absolutely nothing before this court, nothing presented in brief, nothing presented at trial that would evidence that huge hurdle has been met. Now, if I walk through briefly the evidentiary issues that have been raised by the appellants as they were presented to you this morning, that might be the quickest and most efficient way. The first issue was Dr. Dubow, and I think the court honed in on the issue here. The scope of cross-examination of an expert witness is within the sound discretion of the trial court.  The evidence that was offered was not used to attack or impeach a party. It was used to impeach the witness. In this case, a police expert was relying on the ACOG monograph to support his opinions or her opinions. This is a publication that's put out by ACOG. It essentially says that the injuries that occurred in this case are only caused by maternal forces as opposed to excessive lateral traction. And I bring that up because that's the key issue in this case. It's not whether a C-section should have occurred or how delivery should have occurred. It's whether or not this doctor or this practice reached the standard of care by applying too much or excessive lateral traction during delivery. That's the only issue. And in relying on this monograph, that was the basis for the opinions that the police did not violate the standard of care. Dr. Dubow, who used to be a member of ACOG, did not agree with the reliance on this monograph, did not believe in the opinions and the basis for the opinions that were set forth in this monograph. And so during cross-examination, it was brought up that Dr. Dubow is no longer a member of ACOG naturally. That goes towards his bias. Why doesn't he subscribe to the views and the beliefs that are held by this monograph? Well, it's potentially because he's not a member of ACOG. He does not subscribe to their precepts. This is all relevant to Dr. Dubow's credibility. It's relevant to his bias and his prejudice in his opinions. No different than the question of how much money is an expert being paid for their testimony and their opinions. It goes towards their bias. The second area was Dr. Grimm. Dr. Grimm was a police expert, and there are, although there are several arguments made as to why Dr. Grimm should have been permitted to testify as to certain things, the ones that appellant focused on in oral argument raised this issue of this Croft study, which was shown to the jury and uses the word excessive traction. The witness, not the judge, questioned what depends what you mean by excessive traction and posed that question back to counsel. Counsel, nobody knew what excessive traction meant because it was used by the study drafters. It was not a term that was being used by the expert. It was used by the study drafters. So the court stepped in and didn't say the study was meaningless. The court said, absent a definition and understanding of what the preparers of this study meant by excessive traction, this would be confusing to the jury. Despite all of that, despite that conversation that went back and forth between the parties, the appellants were permitted to ask their questions, and the jury was permitted to draw whatever inferences they were going to draw from the use of it. The next area that was addressed by appellants was the testimony of Dr. Hitt and Dr. Hayes, who were two of the partners of Dr. Welsh, whose care is at issue. Your Honor picked up on it, or your Honors picked up on it. The appellants called Dr. Hayes and their case in chief. They opened the door when they asked the question regarding gestational size. They asked how you determine that. The answer was, it's a subjective determination. Everybody determines it a little bit different and subjective, and I have confidence in his ability to subjectively assess gestational size. Again, this is a problem of their own making that they are now complaining about. The animation. The animation was disclosed in the pretrial exhibit list. It said animations. Appellants never asked for a copy of the animation. Appellants never asked to see the animation until it was presented at trial. Lost earnings capacity. This is an interesting argument because the survey that plaintiff's expert relies on is a census survey. The purpose of the survey is to determine employment status, not to determine lost earnings. So the court properly— Well, if the court sustains the finding of no liability, we wouldn't get to that, would we? Correct. It would be irrelevant. The lower court found—the jury found that there was no breach in the standard of care, so assuming that this court would uphold that. What about the back-and-forth on the C-section question? On the C-section section, again, Your Honor, you're absolutely correct. The experts agreed. Both sides' experts agreed that whether it was a C-section or a vaginal delivery, that was not the issue in this case, and the parties agreed that they would not be presenting evidence on the need for a C-section. Again, the only issue in this case was the amount of— Did my clients apply excessive lateral traction during the delivery? It had nothing to do with whether a C-section was utilized or whether a vaginal delivery occurred. It is also significant that during the exchange between appellants' counsel and the judge at the bench, appellants slipped. They actually slipped, and they referenced during their argument that their intent was not to show— not to use this evidence to show gestational size or to show unpreparedness for the procedure, but rather to introduce evidence that the parties specifically agreed that they would not otherwise introduce regarding whether or not it was appropriate to do a vaginal delivery. What about all of the interjections by the court here at the trial, the things that they argue were inappropriate, and sort of put the finger on the scale? You know, it's an interesting effort to sort of distract from what happened during the 10 days. If you place everything in its proper scope, there were things that occurred during the course of the trial. There were things that were said to counsel for the appellees that they, too, were not, you know, pleased about. That's what happens at trial. Unfortunately, for the appellants, the jury found against them. So they're sitting on that side of the room, and we're sitting on this side of the room. But when you look at the overall context in a 10-day trial, the judge was pretty fair. The judge called the balls and strikes. You know, we joke about it in some level that it's like a baseball game, and you're calling balls and strikes. That's what happened here, and the judge did that. There are plenty of examples, and I'll give you a few, of what the court said to us. Similar comments. In one exchange, the court referenced that. He said, I think that is silly. I do not think, counsel, that is a legitimate question. Another time, counsel was admonished for not accurately reading a quote. And appropriately so, but we were still admonished. Another time, counsel was chastised to ask a non-leading question to an expert before objections would be made by the appellants. This went on during the course of the trial, back and forth, back and forth. And both sides, at various times, took criticism from the court for things they did or did not do. I think when you look at some of the criticisms or concerns that are being raised by the appellants and you put them into context, you see that they really were not always unfair. For example, there was another agreement between the parties that appellants would not criticize or attack an appellee's expert for not challenging their expert's opinion. Nonetheless, in an opening statement, they stood up and they did just that. And so, of course, the court was going to admonish them for that. The court did not admonish them in front of the jury. The court did it in private, and rightfully so, appellants apologized for it. So when everything is placed in context of a 10-day trial, when everything is placed in the context of many witnesses, many different exchanges, I think the evidence is overwhelming that it was a fair and just trial, that the jury came to a reasoned verdict, and there's nothing in the record that would establish that this court abused its discretion and its ruling swayed the decision of the jury. Thank you. All right. So is Mr. Hurley going to talk to us now for your part? Okay. Good morning, Your Honors, and may it please the Court. We did, on behalf of the appellees, we did file a cross-appeal. We've sat and listened to 27 minutes so far of evidentiary disputes about what happened at the trial. But had the trial court properly exercised its great gatekeeping function under Rule 702 in Daubert, this case never would have gotten to trial in the first place. And it's important to not lose sight of that fact. As Mr. Blumenfeld mentioned, the sole issue in this case was whether Dr. Welch met the applicable standard of care when he faced the shoulder dystocia in June of 2013. And to support Appellant's case, they had three experts come in, two causation experts and a standard of care expert, Drs. Allen, Dubow, and Kozin. And what each of those experts ultimately opined at trial was the only possible way that this injury could have happened was by Dr. Welch applying lateral traction, that's bending the baby's neck, or excessive traction, applying too much force. As we argued before trial and during trial, the opinions of Drs. Dubow, Allen, and Kozin lacked a sufficient factual foundation and were not based on a reliable methodology and therefore should have been precluded disposing of the case in its entirety. Contrary to Appellant's argument, a lack of factual foundation and unreliable methodology is not a matter that goes to the weight of an expert's testimony. It goes to the ultimate invisibility. And that should have been sorted out pre-trial with the district court exercising its gatekeeping function. Three brief points on this issue. Appellant's experts ignored the only evidence in the case about what happened during the actual delivery, and that's Dr. Welch's testimony, that he did not, in this case or in any case, ever use lateral traction. They want to discard Dr. Welch's testimony as self-serving because it doesn't fit their narrative, but you can't just ignore the facts in the record, the evidence in the record. There was nothing to controvert Dr. Welch's testimony or to support Appellant's experts' opinions. Second, Appellant's experts failed to consider that the child's injured shoulder, the left shoulder, was posterior during delivery, which all experts would agree would have occurred before Dr. Welch even laid a hand on the baby during delivery and would have been caused only by maternal forces. And finally, Appellant's experts' opinions fly in the face of the current generally accepted medical and scientific literature in this field, which was set forth in 2014 in the ACOG monograph. Had this case proceeded in 1990, perhaps their experts would have had a methodology that was reliable, but in the ACOG monograph, the monograph itself expressly rejects the opinion that Appellant's experts offered at trial, and for all of those reasons, the district court should have excluded them. Thank you. All right, thank you, Mr. Hurley, and you're going to be the one doing the rebuttal on the cross appeal? Yes. Will you come up? Okay. So, Mr. Cardelli, you get to rebut anything they've said. May it please the Court. Your Honor, you asked whether it was logical to conclude that there was a bias on the basis of Dr. DeBow's withdrawal from ACOG. Candidly, the only time that defendants in this case ever argued about Dr. DeBow potentially having bias was outside the presence of the jury. Any time they were before the jury, their comments only dealt with his character. They dealt with whether he was thorough, whether he did a good job in this case. They told the jury during closing that Dr. DeBow had a history of being wrong, that a doctor was sued because he didn't review the right files. These are all facts that had nothing to do with this case. They were completely outside of it, and they had nothing to do with ACOG or bias against ACOG. Also importantly, at Dr. DeBow's deposition and at his trial, he offered the same opinions in this case, and what happened in between those two events was his withdrawal from ACOG. There was no showing that any of his opinions changed or that his beliefs about the causation of brachial plexus injuries changed at all because of his withdrawal from ACOG. There was a lot of discussion about excessive traction and what that meant. There was no question in this case what excessive traction meant to the witnesses at trial. It was clear and undisputed that excessive means anything more than the usual gentle traction that a doctor uses to deliver. The question that the expert was asking and that the court commented on was how the study itself defined it. Did they use an amount of force? That was not shown. The importance of the Croft study is that what it did say is that if you change the behavior of the delivering physician, you get a different outcome. You avoid injuries. Why is that important? Because the whole defense theory in this case, the other causation possibility that they told the jury about, was that these injuries occur before the head even delivers. Well, if the injuries occur before the head delivers, how can we possibly change the management of the obstetrician and get a different outcome? It doesn't make any sense. And so what the Croft study showed was that what the defense was telling the jury about the causation of these injuries was not right. There was a lot of discussion about the C-section. There was no agreement between the parties that C-section wouldn't be discussed. What was clear was that the plaintiff's experts and plaintiff's counsel weren't going to be arguing that C-section was required by the standard of care. So what the court then did is, based on the fact that there was no standard of care testimony about that, the court then said, well, we're not going to talk about C-section at all then. The problem is the C-section is what provided critical context of the large baby to the jury. It said that, listen, this defendant's partner was so concerned about the size of the baby that she decided that a cesarean section was necessary. And then Dr. Welsh himself then comes to provide care for this patient, never reviews the records, never appreciates the concern, and changes the plan of care. It goes to the kind of care that he provided to this patient from start to finish. In opening by defendant's counsel, there was a comment that this was not the day that Dr. Welsh forgot how to deliver a baby. Well, the truth is they wanted to provide a narrative that he always did the same thing and he always provided proper care. Why did they have to do that? Because he had no memory of this delivery and he didn't chart in the record anything about the direction or strength of force that he used to deliver the child. Was it accurate that the district court allowed the testimony, quote, only to show a potential lack of concern or assiduousness about Dr. Welsh toward Dorman? Because that was possibly relevant to his credibility. That was testimony relating to the size of the baby, I believe, Your Honor. I'm not sure. It's from JA 1925. What I believe you're referring to, Your Honor, is the court allowed the parties to tell the jury that there was concern about the size of the baby. But we were not allowed to tell them what the clinical significance of that was. And so what ended up happening in the trial and was discussed is that Dr. Hayes, the defendant's partner, says at trial that she had no concerns about the size of the baby. Well, the lawyers and the judge knew that that was not true. She actually changed the plan of care because of her concerns. But when plaintiff's counsel asked the court to find that she opened the door to discussion of cesarean section, the court refused to allow us to do that. And so at no point did the jury hear any of that context for what they were being told. Also, it's important to note, Dr. Hayes, even though she was called by plaintiffs, she was an adverse witness. She was an owner, partner of the defendant. And the question and answer that she was asked is on JA 2576. You will see that the question and the answer that she gave about her concerns are totally different from what was being asked. And so it wasn't that the plaintiffs asked her what her opinion was and she gave it. She gave a completely different answer from what was being asked of her. As to, briefly, the neonatal brachial plexus palsy publication put out by ACOC, there is nothing in that document, as was said a number of times throughout the trial, that says that permanent or five-level brachial plexus injuries can be caused by the maternal forces alone. And what we had here is we had experts by the defense and counsel now in their papers as they attack under Daubert plaintiff's causation experts. They say that they failed to consider that the maternal forces of labor could have caused this injury. Well, the problem is the literature doesn't close the analytical gap that they wanted our experts to have to do at trial. The literature does not provide a basis for an expert to say that a five-level brachial plexus injury can be caused by the maternal forces alone. And Dr. Grimm acknowledged herself that there was not consensus on this as they drafted. All right. Counsel, is there anything else you want to tell us very briefly?  All right. Thank you very much. Mr. Hurley, you get the last word on the cross-appeal. Thank you, Your Honor. Very briefly, appellants experts, there are three experts, their ultimate opinion in the case was that the only way that this injury could have occurred was through physician-applied traction, exogenous forces. In the ACOG monograph, they specifically state and conclude, and I quote, in addition to research within the obstetric community, the pediatric, orthopedic, and neurologic literature now stress that the existence of NBPP, neonatal brachial plexus palsy, following birth, does not a priori indicate that exogenous forces are the cause of this injury. That is based on the current, as of 2014, medical and scientific literature, the community expressly rejecting the outdated and unreliable opinions of appellants experts. Appellants experts failed to consider the new, modern, updated technology, or research in the field, the studies that have come out in the field, and that makes their opinions unreliable. And I didn't have a chance to address it on direct, but I'll briefly just address our second cross-appeal argument, which is the district court was correct in finding that the appellant's economic experts were not allowed to offer a specific opinion as to the amount of lost earning capacities of PM, but we submit that the district court did not go far enough, and he still allowed those experts to offer a speculative opinion that the child necessarily would have suffered some loss of earning capacity. We respectfully submit that those opinions were speculative, not based on a reliable methodology, and lacked a factual foundation. So, unless the court has any questions, we'll rest. Thank you very much. We'll come down to Greek Council and move on to our last case. Thank you.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker